# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### ST. JOSEPH DIVISION

| | |
|---|---|
| SANDRA LYNN HEMME, | ) |
| | ) Case No. 5:25-cv-06132-RK |
| Plaintiff, | ) |
| | ) |
| v. | ) Judge Roseann A. Ketchmark |
| | ) |
| THE CITY OF ST. JOSEPH, MISSOURI; | ) |
| STEVEN FUESTON; | ) |
| HOWARD KEMPER; | ) |
| LLOYD PASLEY; and | ) Jury Trial Demanded |
| WALTER SIMPSON, as Defendant ad Litem | ) |
| for JAMES ROBERT HAYES; TERRY | ) |
| BOYER; RONALD FISHER; MIKE | ) |
| HIRTER; and JOHN MUEHLENBACHER, | ) |
| | ) |
| Defendants. | ) |

## SECOND AMENDED COMPLAINT

Plaintiff SANDRA LYNN HEMME, by her undersigned attorneys, complains of

Defendants THE CITY OF ST. JOSEPH, STEVEN FUESTON, HOWARD KEMPER, LLOYD

PASLEY, and WALTER SIMPSON, as Defendant ad Litem for JAMES ROBERT HAYES,

TERRY BOYER, RONALD FISHER, MIKE HIRTER, and JOHN MUEHLENBACHER

(sometimes, collectively, the "Defendants"), as follows:

### INTRODUCTION

1. Plaintiff Sandra Hemme spent 43 years in prison following her conviction for the

November 1980 murder of Patricia Jeschke—a crime in which Plaintiff had no involvement

whatsoever. Plaintiff's false conviction was not an accident. In 1980, Plaintiff was 20 years of

age and suffering from serious mental illness. Lacking any good reason to suspect Plaintiff, the

officer Defendants fixated on her as the perpetrator; interrogated her in eight separate sessions

over two weeks; and, taking advantage of her extreme vulnerability, coerced her into confessing to the murder. There was never any objective evidence tying Plaintiff to the crime.

2. In the days following Plaintiff's false confession, compelling evidence emerged that the person who killed Ms. Jeschke was one Michael Holman—a St. Joseph police officer and one of the officer Defendants' colleagues. To protect Holman, the Defendants concealed evidence of his guilt and chose not to follow the evidence leading to Holman.

3. Because of Defendants' egregious constitutional violations, Plaintiff was convicted and spent most of her life imprisoned for something she did not do.

4. This lawsuit seeks redress for Defendants' investigatory misconduct from 1980 to 1985 leading to Ms. Hemme's conviction; the use of false evidence in each of Ms. Hemme's proceedings from 1980 through 1993; the destruction of exculpatory evidence; the failure to intervene and respond to records requests in post-conviction years; and the SJPD's patterns and practices. This lawsuit seeks compensatory damages for severe and traumatic bodily injuries sustained by Plaintiff which were actually and proximately caused by Defendants' misconduct.

## JURISDICTION AND VENUE

5. This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331 and 1367.

6. Venue is proper under 28 U.S.C. § 1391(b). All of the events giving rise to the claims asserted herein occurred within this judicial district.

## PARTIES

7. Plaintiff Sandra Lynn Hemme was wrongfully imprisoned for 43 years for the murder of Patricia Jeschke.

8. Defendants Terry Boyer, Ronald Fisher, Steven Fueston, Mike Hirter, and John Muehlenbacher were police officers in the St. Joseph Police Department. They are being sued in

their individual capacities. Defendants Boyer, Fisher, Hirter, and Muehlenbacher are deceased, and Walter Simpson serves as the Defendant ad Litem for these deceased Defendants. Upon information and belief, they were insured against liability for damages for the wrongdoing alleged herein, either via the City of St. Joseph's indemnification obligations or via private insurance. The City of St. Joseph purchased insurance policies that covered all individual Defendants for the misconduct alleged by Plaintiff in this Complaint, including but not limited to an insurance policy issued by Hartford that provided coverage for false arrest, detention or imprisonment, or malicious prosecution. In accordance with Missouri Rev. Stat. § 537.021, Plaintiff will seek the appointment of a defendant ad litem to act as the party defendant for these individuals.

9. At all times relevant to this Complaint, Defendant Lloyd Pasley was employed by the St. Joseph Police Department. Pasley served as a Captain and supervising officer in charge of the day-to-day management of the Jeschke murder investigation, until Defendant Hayes removed him from the investigation. Defendant Pasley served as Interim Chief of Police later in his career. He is being sued in his individual capacity.

10. At all times relevant to this Complaint, Defendant Howard Kemper was an investigator working for the Buchanan County Prosecutor's Office. He is being sued in his individual capacity.

11. At all times relevant to this Complaint, Defendant James Robert Hayes was the Chief of the St. Joseph Police Department. Pursuant to the St. Joseph City Charter and the Administrative Code, Defendant Hayes was St. Joseph's final policymaker for law enforcement and criminal investigations at all times relevant to this Complaint. Defendant Hayes was intimately involved in the Jeschke murder investigation, and either personally or though

Defendant Pasley, supervised all aspects of the investigation. He is being sued in his individual and official capacity. Defendant Hayes is deceased. Upon information and belief, he was insured against liability for damages for the wrongdoing alleged herein, either via the City of St. Joseph's indemnification obligations or via private insurance. The City of St. Joseph purchased insurance policies that covered all individual Defendants for the misconduct alleged by Plaintiff in this Complaint, including but not limited to an insurance policy issued by Hartford that provided coverage for false arrest, detention or imprisonment, or malicious prosecution. In accordance with Missouri Rev. Stat. § 537.021, Plaintiff will seek the appointment of a defendant ad litem to act as the party defendant for Defendant Hayes.

12. Defendants Boyer, Fisher, Fueston, Hayes, Hirter, Kemper, Muehlenbacher, and Pasley are collectively referred to as "Individual Defendants." All of the Individual Defendants acted under color of State law.

13. Defendant City of St. Joseph is a Missouri Charter City, formed pursuant to the Constitution of the State of Missouri. The City of St. Joseph includes the St. Joseph Police Department. At all times relevant to this complaint, the City of St. Joseph employed the Individual Defendants.

## ALLEGATIONS OF FACT

### The Murder of Patricia Jeschke

14. Patricia Jeschke was murdered in the evening of November 12, 1980.

15. Jeschke had worked from 8:00am to 5:00pm at the St. Joseph public library on the day she was killed. She was last seen driving alone in her white, two-seater sports car in downtown St. Joseph.

16.     The next day, Jeschke's mother found her daughter's dead body lying naked on the floor next to Jeschke's bed. A pillow covered her head. Jeschke's hands were tied behind her back with a telephone cord and her neck was strangled by a pair of pantyhose.

17.     Blood from wounds and lacerations on Jeschke's head covered the floor. The most prominent injuries on Jeschke's head were a hole-shaped wound apparently caused by a blunt object, and other lacerations consistent with knife cuts. A hammer was found nearby, and a steak knife was discovered underneath Jeschke's head.

18.     Additionally, the coroner determined that redness and abrasions on Jeschke's vagina were "consistent with" some sort of sexual activity having occurred.

19.     The St. Joseph Police Department was responsible for the investigation of the murder.

20.     Officers canvassed the area in the immediate hours after Jeschke's body was discovered. Two witnesses reported seeing a strange white pickup truck parked near Jeschke's home the day she died.

21.     Officers also recovered two hairs at the crime scene they believed came from a Black person. But the evidence from the scene did not point to any particular suspect. As of November 28, 1980, more than two weeks after the murder, Defendants had no promising leads and no idea who had committed the crime.

**Sandra Hemme Had Nothing to do with the Jeschke Murder**

22.     Around the time of the Jeschke murder, Plaintiff was a 20-year-old woman who was confined in a psychiatric ward at the St. Joseph State Hospital because of her serious mental illness.

23. Plaintiff struggled with psychiatric impairments and various addictions throughout her life. She spent most of her time between ages 12 and 19 in psychiatric hospitals or youth treatment centers to treat thought disorders (auditory hallucinations, derealization, depersonalization), mood disorders (depression and anxiety), and substance abuse disorders.

24. Plaintiff underwent extreme treatment measures, including Electroconvulsive Therapy, that caused her to suffer severe memory loss and learning difficulties.

25. In the days before Jeschke was murdered, Plaintiff was being treated for substance abuse at the St. Joseph State Hospital. She was discharged against medical advice around 1:00pm on November 12, 1980, the last day that Jeschke was seen alive.

26. As would be revealed much later—and only through the memories of other people due to Plaintiff's inability to accurately recall her whereabouts—a man named Bobby Cummings picked Plaintiff up shortly after her discharge from the hospital and drove her to Dearborn, Missouri.

27. Plaintiff then hitchhiked to her parents' home in Concordia, Missouri. She arrived there around 8:30 to 9:30pm on November 12.

28. Plaintiff left the next morning to see her boyfriend in Lexington, Missouri, and did not return to St. Joseph until November 14, 1980. Plaintiff had nothing to do with the murder of Patricia Jeschke. In fact, she was not even in St. Joseph when the murder occurred.

**Defendants Coerce Plaintiff into Falsely Confessing to the Murder**

29. On November 28, 1980, despite having no evidence of any kind connecting Plaintiff to the Jeschke murder, Defendants decided to interview her about that crime. At that time, Plaintiff was being held in the psychiatric ward on a 96-hour involuntary hold because her mental illness had caused her to go to the home of a former nurse and threaten the nurse with a

knife. Without evidence, Defendants speculated that that unrelated incident might somehow be related to the Jeschke murder.

30.     While Plaintiff was being held involuntarily, doctors attempted to manage Plaintiff's psychiatric symptoms by prescribing powerful medications designed to sedate and control her. Plaintiff was receiving near-daily injections of Haloperidol, an antipsychotic medication, to control her sporadic agitation (this medication subdued Plaintiff's physical responses: it caused her body to become rigid, her eyes to roll into the back of her head, and her speech to slur); she was receiving Cogentin, to control the muscle stiffness caused by Haloperidol; Plaintiff was given Chloral Hydrate, a sedative used to treat insomnia; and she was prescribed Navane, an antipsychotic medication that disrupts cognitive function and impairs memory. These medications caused Plaintiff to experience severe pain. At times, when Plaintiff acted erratically, nurses also placed Plaintiff in leather wrist restraints to control her movement.

31.     Notwithstanding Plaintiff's profound vulnerability and the cognitive limitations produced by the powerful drugs being administered to her—at times, the medications caused Plaintiff to be unable to hold her head up straight—Defendants Fueston, Hirter, Kemper, and Boyer chose to interrogate Plaintiff about the Jeschke murder in eight separate interrogation sessions between November 28 and December 10, 1980.

32.     Plaintiff's pre-existing mental impairments, as well as the effects of the antipsychotic medication she was prescribed, impaired Plaintiff's ability to accurately recall her whereabout on the day that Jeschke was murdered. The drugs and her psychiatric impairments destroyed Plaintiff's ability to resist suggestion.

33. Defendants Fueston, Hirter, Kemper, and Boyer were fully aware of Plaintiff's limitations as set forth above. They specifically chose to interrogate Plaintiff while she was confined at the State Hospital and under the influence of antipsychotic medications.

34. In the interrogation sessions, Defendants Fueston, Hirter, Kemper, and Boyer deliberately took advantage of Plaintiff's vulnerable mental state by pressuring Plaintiff and feeding her information. For example, one of their interrogation sessions was conducted at the scene of the crime, which afforded them an opportunity to implant information in Plaintiff's mind concerning the crime scene and the manner in which the murder was committed.

35. Defendants also asked Plaintiff questions designed to steer her toward inculpatory answers. For instance, Defendants Fueston and Kemper took Plaintiff on a ride along to recreate the events of the fabricated story Defendants were planting in Plaintiff's mind. On that ride along, Plaintiff was able to point out Jeschke's home as the site of the murder only because Defendant Fueston prompted Plaintiff, "Do you recognize anything?" when they got within the vicinity of the home. Jeschke's home was the only thing Plaintiff could point out in the rural landscape. As another example, in the interrogation session on December 10, Defendant Fueston asked Plaintiff, "Did you notice anything around in the bedroom? We talked about a window?" Plaintiff had not mentioned anything about a window up to this point in the interrogation session, but this question prompted Plaintiff to falsely state that she saw a broken window in Jeschke's bedroom, a fact that Plaintiff could have learned only from Defendants.

36. Over the course of the multiple interrogation sessions, Plaintiff provided divergent accounts of her whereabouts and actions on the day of the Jeschke murder. Plaintiff initially told Defendants, truthfully, that on November 12 she hitchhiked to her parents' home and returned to St. Joseph a few days later. Under pressured and suggestive questioning from

Defendants, Plaintiff provided several demonstrably false accounts. For example, in an early version of her statement, Plaintiff asserted that she and a man named Joe Wabski had committed the murder; this assertion was conclusively proven false when evidence showed that Wabski was not in St. Joseph at the time of the murder. Even in Plaintiff's final version, there were still glaring inaccuracies, such as recounting the wrong color of Jeschke's car and mentioning a cat in Jeschke's home that never existed. As a result of hearing these divergent and false accounts, Defendants learned (to the extent they did not already know) that Plaintiff could not reliably recall her actions on November 12, 1980 and had no knowledge of the murder. They had no evidence suggesting otherwise.

37. Nonetheless, Defendants persisted with their coercive interrogation techniques and ultimately secured the false confession that was used to charge and falsely convict Plaintiff of the murder. On December 10—the culminating interrogation session following prior sessions in which the "facts" of the murder had been implanted in her mind—Plaintiff falsely asserted that she hit Jeschke in the head with a blunt object; stabbed her in the head multiple times; wrapped pantyhose around her neck; bound her hands with an antenna cord; and pushed the handle of a knife into Jeschke's vagina.

38. Although other officers performed the interrogations, Defendants Pasley and Hayes, as the officers supervising the Jeschke murder investigation, were aware of Hemme's vulnerable mental condition; the repeated interrogations she was subjected to; the coercive tactics being used in those interrogation sessions; and the false confession that other Defendants were extracting from her. Pasley and Hayes condoned and encouraged the interrogating Defendants' coercive tactics.

**Defendants Conduct a Reckless Investigation**

39.     No evidence connected Plaintiff to the Jeschke murder besides the false confession. Defendants knew that the confession was false because they fabricated it.

40.     At the same time Defendants were interrogating Plaintiff, significant evidence was emerging that implicated one Michael Holman in the crime. Holman was a police officer in the St. Joseph Police Department.

41.     Officers throughout the St. Joseph Police Department knew that Holman owned the white truck that was observed at Jeschke's house the night of her murder. Holman had falsely reported the truck as stolen as part of a scheme to defraud his insurance company. When that fraud was revealed, officers realized that his "stolen" truck matched eyewitness accounts of a white truck that had been seen near Jeschke's home around the time of her murder.

42.     Officers next discovered that Holman had attempted to use Jeschke's credit card *the day after she was murdered*. An employee of the store at which Holman tried to use the credit card picked Holman out of a photo array and identified him by name as the man who tried to use Jeschke's credit card.

43.     Defendants Pasley, Boyer, and Hayes interviewed Holman and asked him how he came upon Jeschke's credit card. Holman admitted they "were not going to believe his story," then proceeded to claim that he had stopped at a motel across the street from Jeschke's house to have sex with a woman named "Mary." Holman said that, afterward, when he was walking back to his car, he stepped on Jeschke's purse and found her credit card in it. He claimed to have taken the credit card out and thrown the purse in a dumpster.

44.     Holman refused to provide any information that could corroborate this alibi. He refused to draw a diagram of the motel room in which he had sex; he refused to provide

"Mary's" last name; and, after speaking with his uncle Doyle Rucker (another St. Joseph police officer) midway through the interview, Holman refused to answer any more questions.

45.     Detective Fueston tried to independently verify Holman's alibi but was unable to do so. None of the motel employees remembered seeing Holman on November 12, and Defendant Fueston could not find the purse in any dumpsters.

46.     Soon, other details began to emerge that pointed to Holman as a leading suspect. The two black hairs recovered from the crime scene—that St. Joseph police officers believed came from a Black person—were microscopically compared to hairs recovered from Holman. Holman, who was Black, could not be ruled out as the source of the hairs from the crime scene.

47.     Additionally, Defendants Muehlenbacher and Fisher searched Holman's home looking for evidence related to the Jeschke murder. There, they found a pair of Jeschke's earrings hidden in a closet amongst other jewelry that Holman had stolen in a separate burglary. Defendants Fueston and Hayes knew that the earrings belonged to Jeschke and wrote police reports documenting their knowledge. Upon information and belief, Defendants Boyer, Kemper, Pasley, Muehlenbacher, Hirter and Fisher also learned that the earrings belonged to Jeschke and were part of the conspiracy to suppress this evidence.

48.     Holman had committed a litany of other crimes around the time of the Jeschke murder. In addition to fraudulently reporting his white truck as stolen, Holman also fraudulently reported that his home had been broken into. Also, at around the same time, Holman committed at least three burglaries. Finally, Holman's own colleague arrested him in a "peeping tom" incident about seven months after Plaintiff was arrested.

49.     In order to protect Holman and recognizing that the emerging evidence powerfully implicated Holman, Defendant Hayes stopped the investigation into Holman the

same day Defendants found Jeschke's earrings in Holman's house. Defendant Pasley urged Hayes to continue investigating Holman given the growing evidence against him. But Hayes refused. To punish Pasley for questioning the direction and integrity of the investigation, and to ensure that Holman would not be investigated further, Hayes transferred Pasley off the case.

**Plaintiff's Wrongful Conviction and Exoneration**

50. Despondent and continuing to suffer from mental illness, Plaintiff initially entered a guilty plea to the Jeschke murder in April 1981.

51. The judge presiding over Plaintiff's case insisted that she provide a detailed description of the Jeschke murder in order for him to accept Plaintiff's guilty plea. At a hearing, Plaintiff recounted a different story than what she relayed in her December 10, 1980 false confession. The judge rejected Plaintiff's plea for lack of a sufficient factual basis. However, after a recess in which the prosecutor and Plaintiff's lawyer reminded Plaintiff of the facts she had previously adopted, Plaintiff gave an account consistent with her false confession. The judge accepted Plaintiff's guilty plea and sentenced her to life in prison.

52. Plaintiff thereafter retained new counsel, who filed a motion to set aside the guilty plea due to the inadequacy of Plaintiff's original counsel and Plaintiff's mental impairments. The motion was granted on appeal.

53. In June 1985, Plaintiff was tried by a jury for capital murder. The only evidence against Plaintiff was her false confession. Plaintiff's counsel had no access to the suppressed exculpatory evidence which would ultimately exonerate Plaintiff.

54. After her wrongful conviction, Plaintiff fought for over forty years to prove her innocence.

55.     In February 2023, Plaintiff filed a petition for writ of habeas corpus in the Circuit Court of Livingston County, Missouri, based on newly discovered evidence establishing that Plaintiff was actually innocent of the Jeschke murder.

56.     In June 2024, Judge Ryan Horsman found that material exculpatory evidence had not been disclosed to Plaintiff in violation of *Brady v. Maryland*, and that Plaintiff had established a claim of actual innocence. Judge Horsman granted Plaintiff a writ of habeas corpus. *Hemme v. McBee*, Case No. 23LV-CC00008 (Circuit Court of Livingston County, Missouri).

57.     The State of Missouri sought a writ of certiorari, but the Missouri Court of Appeals refused to quash the habeas record. *State ex rel. Bailey v. Horsman*, 700 S.W.3d 1 (Oct. 22, 2024). The Court ordered that Plaintiff be discharged from custody unless the State decided to retry Plaintiff.

58.     On March 17, 2025, after the State of Missouri declined to retry her, Plaintiff's case was closed by court order.

**Defendants Withhold Exculpatory Evidence and Fail to Intervene**

59.     Defendants withheld evidence that exculpated Plaintiff and implicated Holman. The evidence was not disclosed to Plaintiff, her lawyers, or the prosecutor, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

60.     Defendants suppressed the fact that Holman had committed several crimes around and after the time of the Jeschke murder, including (1) multiple instances of fraud; (2) at least three separate burglaries; and (3) a "peeping tom" incident in which Holman was caught peering into the homes of other people.

61.     Defendants suppressed the fact that Jeschke's earrings were found in Holman's home.

62. Defendants suppressed a fingerprint report finding that Jeschke was not the source of fingerprints on a Playgirl magazine that, according to Plaintiff's false confession, Plaintiff had stolen from Jeschke's home after murdering her.

63. Defendants suppressed another fingerprint report noting that analysis of a latent palm print found on the antenna wire near Jeschke's body excluded Plaintiff as the source. The report also requested better prints from Holman for comparison.

64. Defendants suppressed a laboratory report excluding Officer Vernon Burris as the source of the two hairs that St. Joseph police officers found at the crime scene and believed came from a Black individual. Officer Burris was the only Black individual who helped process the crime scene. At Plaintiff's trial, the prosecution argued that the black hairs came from Officer Burris, not Michael Holman.

65. Defendants suppressed Holman's plea agreement from a different criminal case in which the prosecution agreed to immunize Holman from prosecution for the Jeschke murder.

66. Upon information and belief, Defendant Hayes knew this evidence existed and either personally suppressed and withheld it or ratified the decision of other Defendant officers to suppress and withhold it.

67. In addition to withholding and suppressing *Brady* evidence during the Jeschke investigation and Plaintiff's trial, Defendants had distinct constitutional, statutory, and legal obligations to locate and disclose material exculpatory evidence to Ms. Hemme or her post-conviction attorneys in connection with Plaintiff's post-conviction proceedings that were determinative of whether Ms. Hemme would remain incarcerated. In April 1988, Hemme filed a Motion for Post-Conviction Relief (the "1988 MPCR"). The 1988 MPCR was litigated for five years, ending with a final denial of relief on March 2, 1993. Defendants knew about these post-

conviction efforts and the bases for them and had the opportunity and duty to come forward with exculpatory evidence that established Hemme's innocence. Instead, Defendants concealed and/or destroyed evidence of Hemme's innocence and continued to present false and misleading information and statements to Hemme's counsel and the post-conviction courts. Defendants' misfeasance or nonfeasance during this period of time was exceptionally egregious given their knowledge that Holman had been arrested for crimes involving theft and dishonesty and ultimately served prison time in both Missouri and Nebraska. Defendants' misconduct caused the denial of Hemme's post-conviction efforts to prove her innocence during these years, and resulted in decades of additional wrongful incarceration and corresponding bodily and emotional injuries.

68. In or around 2012, Hemme's counsel submitted records requests to SJPD on behalf of Plaintiff. Those requests triggered separate and independent obligations on the part of Defendants to review investigative materials, identify responsive evidence, preserve exculpatory materials, and disclose information bearing on Hemme's innocence. Defendants also became subject to independent obligations under Missouri's Sunshine Law, including Mo. Rev. Stat. § 610.023, which required Defendants to timely respond to open-records requests, disclose non-exempt records, and provide explanations for any withholding or delay.

69. Despite those obligations, SJPD failed to timely disclose responsive records and information. Records were not produced until 2012, when SJPD finally disclosed a package of reports from the Jeschke murder investigation that previously had not been disclosed to the defense. Even then, the disclosure was incomplete. Defendants separately and independently failed to disclose additional exculpatory evidence, impeachment evidence, investigative materials, and physical evidence relating to Michael Holman and the Jeschke homicide. It was

not until 2022 that SJPD produced documents and physical evidence linking Holman to the victim and her home, inculpatory statements made by Holman to police during an interrogation concerning Ms. Jeschke's murder, documents linking Holman to an associate of the victim's, and details concerning similar crimes committed by Holman.

70. Defendants' post-conviction concealment and suppression of exculpatory evidence did not consist merely of a past failure to disclose. Rather, each continued withholding of exculpatory evidence, each failure to respond truthfully to records requests, and each failure to preserve material evidence constituted a separate act that independently prolonged Plaintiff's wrongful imprisonment and denied Plaintiff meaningful access to post-conviction relief, and caused additional bodily injuries, emotional injuries, and other damages.

### Defendants Destroyed Evidence with Potentially Exculpatory Value

71. St. Joseph Police Department evidence technicians collected pieces of evidence that were never forensically tested, either with the knowledge of the Defendant officers or on instruction from them. For example, upon information and belief, an evidence tech collected a rape kit and multiple other hairs from the crime scene. But Defendants destroyed this evidence before any testing was performed on it.

72. Additionally, Defendants destroyed an antenna cord found near Jeschke's body. The antenna cord had a latent palm print on it, and forensic testing excluded both Plaintiff and Jeschke as the source. The forensic report requested better prints from Holman to perform further testing, but upon information and belief, the antenna cord was destroyed before further testing could be performed.

73.     Evidence technicians failed to inspect and gather fingerprints from the toilet seat in Jeschke's home, which first-responding officers discovered had been conspicuously left up. This was unusual given that Jeschke was a woman and lived alone.

74.     Defendants acted in bad faith in mishandling this evidence. They had decided to frame Plaintiff for the murder and decided not to preserve evidence that could disprove their fabrication.

75.     Upon information and belief, Defendants destroyed, concealed, failed to preserve, or failed to maintain additional investigative materials in post-conviction years that would have allowed Ms. Hemme to secure her innocence much earlier, including chain-of-custody records; internal SJPD memoranda; Holman interview notes; Holman disciplinary records; burglary investigation files; evidence inventory logs; photo logs; crime-scene logs; lead sheets; witness follow-up notes; prosecutor-police communications;  internal discussions about Wabski; discussions after Wabski's alibi collapsed; investigative files regarding the white truck; records concerning the earrings;  evidence-room inventory records; records concerning the Black male using the credit card; interdepartmental communications; FBI communications; lab follow-up materials; and supplemental reports.

76.     Upon information and belief, Defendant Hayes either ratified the decision to destroy this evidence or made the decision himself.

**The St. Joseph Police Department Maintained a Culture of Impunity that Permitted Officers to Commit Misconduct Without Punishment**

77.     The misconduct committed against Plaintiff was part of a broader pattern and practice within the St. Joseph Police Department, whereby officers were not punished for their misconduct, creating a culture of impunity that allowed and encouraged further misconduct.

78.　St. Joseph police officers routinely committed misconduct by abusing their positions of authority. For example, officers would frequently steal evidence and other items and sell them for profit. Defendant Hayes knew of this practice and condoned it.

79.　The culture of impunity was fostered by Defendant Hayes' leadership. Defendant Hayes retaliated against any officer who pushed back against Hayes' decisions. Among other instances, Defendant Hayes retaliated against Pasley by removing him from the Jeschke murder investigation when Pasley advocated for investigating Holman further. Upon information and belief, this sort of retaliation discouraged officers from reporting misconduct by Defendant Hayes or other officers because doing so might offend Defendant Hayes and result in retaliation against them.

80.　Many of the Individual Defendants in this case engaged in misconduct that contributed to the culture of impunity. For example, Defendant Kemper once pulled a gun on a prosecuting attorney and threatened him after the two got into an argument.

81.　The culture of impunity that permeated the St. Joseph Police Department caused Plaintiff's wrongful conviction and continued unlawful imprisonment because officers felt they could get away with committing said misconduct.

**The Policies and Practices of St. Joseph Were a Moving Force Behind
The Individual Defendants' Constitutional Violations as Set Forth Above**

82.　The misconduct committed by Defendant Officers against Plaintiff was undertaken pursuant to the policies and practices of St. Joseph and Defendant Hayes, St. Joseph's final policymaker on policing, law enforcement, and criminal investigations.

83.　At all relevant times and for a period of time prior thereto, St. Joseph did not have adequate policies, or provide adequate training to the officers in its police department, on how to question criminal suspects; the necessity to collect and preserve evidence with potentially

exculpatory value; the necessity to disclose evidence from an investigation that tended to exculpate the suspect or impeach others (as required by Brady v. Maryland); and the need to conduct investigations in a non-reckless and even-handed manner. The lack of training resulted in St. Joseph police officers conducting investigations that led to charges against innocent persons for crimes they did not commit.

84. Defendant Hayes and St. Joseph were aware of the need for adequate policies, training, and supervision, but were deliberately indifferent to the need, and made a deliberate choice not to adopt adequate policies, training, or supervision, all of which was an official policy.

85. The lack of training caused other vulnerable individuals, besides Plaintiff, to be wrongfully convicted. For example, in 1979, many of the same officers involved in the Jeschke murder investigation coerced a false confession from Melvin Lee Reynolds by interrogating him nine times. The officers performed hypnosis and gave Reynolds "truth serum" to extract a false confession from him. Reynolds was wrongly convicted and sentenced to life in prison before being exonerated four years into his sentence.

86. Chief Hayes, as the final policymaker for policing-related matters in St. Joseph, directed subordinate officers to destroy evidence with potentially exculpatory value. He directed, approved, and ratified the decision to destroy evidence that could have exculpated Plaintiff.

87. Chief Hayes, as the final policymaker for policing-related matters in St. Joseph, directed subordinate officers to suppress material exculpatory and impeachment evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). He directed, approved, and ratified the decision to withhold evidence from Plaintiff, her attorneys, and the prosecutors in her case.

88. St. Joseph and Hayes failed to supervise and control the actions of subordinate police officers. Upon information and belief, St. Joseph police officers knew that many of their colleagues routinely committed crimes—such as committing robberies and covering up evidence of crimes—but did not report the misconduct. In some cases, such as the investigations against Melvin Lee Reynolds, Defendant Hayes actively promoted a code of silence by threatening to punish officers who dared push back on Hayes' own efforts to frame innocent people of crimes. In Plaintiff's own case, Defendant Hayes promoted a code of silence by removing Defendant Pasley from the investigation when Pasley sought to continue investigating Holman for the murder. The choice to maintain a code of silence covered up a wide range of officer misconduct, including the actions taken by the Individual Defendants in the Jeschke murder investigation.

89. Since Defendant Hayes was the final policymaker for the City of St. Joseph in matters of policing, the actions that he took in the course of the Jeschke murder investigation and the supervision he provided to the Defendant officers in the course of the investigation constituted the policy and practice of the City of St. Joseph.

## INJURIES AND DAMAGES

90. At all times relevant to this Complaint, the conduct of Defendants was willful, grossly negligent, or deliberately indifferent to Ms. Hemme's rights under federal and state law.

91. The unlawful conduct of these Defendants caused Ms. Hemme to be improperly arrested, prosecuted, imprisoned, unfairly tried, wrongfully convicted, and forced to serve more than 43 years in prison for a crime she did not commit.

92. The failure of Defendants to disclose plainly exculpatory information during Ms. Hemme's post-conviction proceedings directly and foreseeably prolonged Ms. Hemme's wrongful incarceration, thereby subjecting her to decades of additional exposure to dangerous

prison conditions, physical violence, inadequate medical care, psychological trauma, and bodily injury.

93.     Ms. Hemme sustained discrete, traumatic personal and bodily injuries that were actually and proximately caused by Defendants' actions, errors, or omissions—including not only their initial investigatory misconduct but their constitutional failures in post-conviction years leading to Ms. Hemme's continued wrongful imprisonment.  Specifically, Ms. Hemme seeks compensation for the following incidents:

a.  Due to the hopelessness of her confinement, and Defendants' concealment and suppression of exculpatory evidence during the post-conviction years, Plaintiff attempted suicide in 1981, 2001, and 2002.

b.  From 1985 through 1994, Plaintiff sustained lasting, physical injuries from being assaulted, battered, and abused by prison guards and other inmates, including in 1986 (Plaintiff broke her arm after prison guards used excessive force against her), 1991 (Plaintiff fractured her elbow), and in 1994 (Plaintiff sustained bruising, scrapes, and trauma from becoming caught in fights within the prison).

c.  Plaintiff was infected with Hepatitis in 1992.

d.  In 2003, Plaintiff sustained a significant eye injury when a guard hit her in the face.

e.  In 2005, Plaintiff suffered severe chemical burns to her body.

f.  In 2018, Plaintiff fractured her right hip when she fell in prison.

g.  In 2020 and 2022, Plaintiff contracted COVID due to the constricted and unsanitary living quarters in which she was kept.

h. In 2022, Plaintiff suffered a seizure and brain bleed caused or exacerbated by the conditions of her confinement and inadequate medical care.

94. Plaintiff sustained additional compensable injuries, including violence, loneliness, isolation and extreme discomfort; extended periods of solitary confinement; recurrent gastrointestinal illness, abdominal distension, electrolyte imbalance, nausea, vomiting, weakness, chest pain, swelling of her extremities, skin conditions, infections, and other objectively documented medical complications throughout her incarceration. Plaintiff also developed loose teeth, infected gums, urinary tract infections, skin rashes, and other medical conditions that were caused and/or exacerbated by the conditions of her confinement and inadequate medical care.

## COUNT I
### Coerced and False Confession
### (Fifth and Fourteenth Amendments)
*Brought under 42 U.S.C. § 1983 Against Defendants Fueston, Hirter, Kemper, Boyer, and Hayes, and the City of St. Joseph*

95. Plaintiff incorporates by reference all the allegations previously set forth in this Complaint.

96. In the manner described more fully above, Defendants coerced Plaintiff into making false statements involuntarily. These statements were repeatedly used against Plaintiff during criminal and post-conviction proceedings over the course of decades, including proceedings between 1981 and 1993, in violation of her rights secured by the Fifth and Fourteenth Amendments.

97. Defendants knew that Plaintiff was in a vulnerable psychiatric state. She was being held involuntarily as a psychiatric patient; she was under the influence of psychotropic drugs; and the false stories that Defendants coerced her into adopting were disproven repeatedly.

98. Defendants took advantage of Plaintiff's vulnerable condition by feeding her information about the crime and continuing to question her, resulting in the disclosed information being incorporated into subsequent versions of Plaintiff's revised story.

99. The confession that Plaintiff provided was wholly fabricated by Defendants over the course of these iterative interrogation sessions and forced upon Plaintiff against her will.

100. The coercion and interrogation misconduct described in this Complaint was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

101. As a result of Defendants' coercion and interrogation misconduct as set forth in this Complaint, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous injuries and damages as set forth above.

102. The policies, practices, and customs set forth above were a moving force behind the Individual Defendants' coercion of Plaintiff's confession and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

### COUNT II
### Deprivation of Due Process, Fair Trial, and Access to the Courts
### (First and Fourteenth Amendment)
*Brought under 42 U.S.C. § 1983 Against All Defendants*

103. Plaintiff incorporates by reference all the allegations previously set forth in this Complaint.

104. In the manner described more fully above, Defendants, while acting individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Plaintiff of her constitutional right to due process and her right to a fair trial.

105. Defendants fabricated evidence against Plaintiff by, among other things, manipulating her into adopting a false inculpatory story.

106. Defendant Officers knew that Plaintiff was in a vulnerable psychiatric state, and they took advantage of Plaintiff's condition by feeding her information about the crime and interrogating her afterward, resulting in the disclosed information being incorporated into Plaintiff's revised story.

107. The confession that Plaintiff provided was wholly fabricated by Defendants over the course of multiple iterative interrogation sessions and forced upon Plaintiff against her will.

108. Defendants also suppressed exculpatory and impeachment evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The suppressed evidence included: the fact that Jeschke's earrings were found in Holman's home; a fingerprint report noting that a latent palm print found on the antenna wire near Jeschke's body excluded Plaintiff as the source and requested better prints from Holman for comparison; a fingerprint report that excluded Jeschke as the source of fingerprints found on a Playgirl magazine that Plaintiff had allegedly stolen from Jeschke's home; a laboratory report excluding Officer Vernon Burris as the source of the black hairs found at the crime scene; documents regarding the investigation and prosecution of Holman for a litany of crimes; and Holman's plea agreement from a different criminal case in which the prosecution agreed to immunize Holman from prosecution for the Jeschke murder.

109. Defendants also acted in bad faith when they destroyed material exculpatory evidence, including fingerprints from the toilet seat; additional hair samples and a rape kit; and an antenna cord that had a latent palm print on it.

110. Defendants also deprived Ms. Hemme of her constitutional right to due process of law and meaningful access to the courts by covering up and concealing from Plaintiff,

prosecutors, post-conviction courts, and Plaintiff's post-conviction attorneys evidence that demonstrated Ms. Hemme's innocence.

111. As a result of these Defendants' acts and omissions, Ms. Hemme was deprived of evidence that would have allowed her to successfully challenge her conviction through post-conviction remedies that were available to her. Such a motion, based on evidence which Defendants hid and/or destroyed, would have been successful and would have exonerated Ms. Hemme and freed her from prison decades prior to her exoneration. Defendants were, at all relevant times, aware of Ms. Hemme's persistent and truthful denial of any involvement in the Jeschke murder. These Defendants were also aware of efforts on behalf of Ms. Hemme and others acting on her behalf to uncover evidence necessary to prove Ms. Hemme's innocence. These Defendants willfully obstructed Ms. Hemme's constitutional rights by continuing to deny her and those acting on his behalf access to evidence which would exonerate Ms. Hemme.

112. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

113. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous injuries and damages as set forth above.

114. The policies, practices, and customs of St. Joseph and Hayes as set forth above were the moving force behind the constitutional violations alleged in this Count and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

115. Defendants conducted a reckless and inadequate investigation into the Jeschke murder by intentionally refusing to investigate Holman adequately and instead framing Plaintiff.

116. Overwhelming evidence pointed to Holman as a leading suspect: his car was seen near Jeschke's home at the time of her murder; he was found using Jeschke's credit card shortly after her murder; nobody could verify Holman's alibi, and he refused to provide any corroborating details himself; Holman committed a string of burglaries and "peeping tom" crimes around the same time; and a pair of unique earrings that belonged to Jeschke were discovered during a search of Holman's house. Despite this evidence, Defendants shut down any investigation of Holman (Defendants' colleague whom they wished to protect) and instead worked to frame Plaintiff by knowingly coercing a false confession out of her and destroying and concealing evidence that could contradict the narrative that Plaintiff committed the murder. Defendants' actions were shocking to the conscience.

117. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

118. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous injuries and damages as set forth above.

119. The policies, practices, and customs of St. Joseph and Hayes as set forth above were the moving force behind the constitutional violations alleged in this Count and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

## COUNT IV
## Malicious Prosecution and Unlawful Pretrial Detention
## (Fourth and Fourteenth Amendments)
### *Brought under 42 U.S.C. § 1983 Against All Defendants*

120. Each paragraph of this Complaint is incorporated as if restated fully herein.

121. In the manner described more fully above, Defendants accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

122. Defendants accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and Defendants made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

123. Defendants made statements regarding Plaintiff's purported culpability knowing that those statements were false. Defendants were aware that no true or reliable evidence implicated Plaintiff in the Jeschke murder, as described more fully above.

124. Defendants unreasonably seized Plaintiff without probable cause and deprived her of liberty, in violation of her rights secured by the Fourth and Fourteenth Amendments.

125. Defendants deprived Plaintiff of fair state criminal proceedings, including the chance to defend herself during those proceedings, resulting in a deprivation of her liberty.

126. Defendants subjected Plaintiff to arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which she was totally innocent. Defendants' actions contravened fundamental canons of decency and fairness and violated Plaintiff's rights under the Fourteenth Amendment.

127. Defendants caused judicial proceedings to be instituted and continued against Plaintiff without probable cause, resulting in injury to Plaintiff.

128. The misconduct described in this Count was undertaken intentionally, willfully, and with reckless indifference to the rights of others.

129. The prosecution of Plaintiff for the Jeschke murder terminated in Plaintiff's favor when her conviction was vacated and she was unconditionally discharged from custody.

130. As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty and sustained injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous injuries and damages as set forth above.

131. The misconduct by all Defendants in this Count was undertaken pursuant to the policies and practices of the St. Joseph and Hayes described more fully, and the policies and practices of St. Joseph and Hayes were the moving force that caused Plaintiff's injuries.

## COUNT V
### Failure to Intervene
*Brought under 42 U.S.C. § 1983 Against All Individual Defendants*

132. Plaintiff incorporates each paragraph of this Complaint as if fully restated herein.

133. All of the Individual Defendants were involved in the investigation of the Jeschke murder.

134. In the manner described above, during the constitutional violations described herein, each of the Individual Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

135. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

136.    Having placed Ms. Hemme in a position of peril and immediate and continuing danger, Defendants were under a constitutional duty to intervene so as to prevent further injury and damage to Ms. Hemme. Defendants were duty-bound to disclose material information bearing on Ms. Hemme's innocence during post-conviction proceedings and records requests that would determine whether Ms. Hemme remained incarcerated.  Ms. Hemme had a clearly established liberty interest in both proving her innocence and her wrongful imprisonment through fair post-conviction proceedings. Defendants had the opportunity and obligation at the time of each post-conviction petition or record request to take action that would have brought Ms. Hemme's wrongful incarceration to an end. Despite having the opportunity and obligation to intervene so as to prevent the further violation of Ms. Hemme's constitutional rights, Defendants failed to do so.

137.    As a result of the Individual Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous injuries and damages set forth above.

138.    The misconduct by all Defendants in this Count was undertaken pursuant to the policies and practices of St. Joseph and Hayes, and the policies and practices of St. Joseph and Hayes were the moving force that caused Plaintiff's injuries.

## COUNT VI
### Conspiracy to Deprive Constitutional Rights
*Brought under 42 U.S.C. § 1983 against all Individual Defendants*

139.    Each paragraph of this Complaint is incorporated as if restated fully herein.

140.    In the manner described more fully above, prior to and after Plaintiff's conviction, the Individual Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime she did not commit and

thereby to deprive her of her constitutional rights, and to exert influence to cause the prosecution of Plaintiff for a crime she did not commit, and took overt actions in conformity with that agreement, as set forth herein.

141. As further described above, the Individual Defendants agreed to focus the investigation on Plaintiff, who they knew or should have known was innocent, rather than pursue mounting evidence that inculpated Holman; to fabricate evidence against Plaintiff, including a false and coerced confession; and to suppress and destroy exculpatory and impeachment evidence.

142. In furtherance of their conspiracy, the Individual Defendants committed overt acts and were otherwise willful participants in joint activity.

143. In this manner, the Individual Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

144. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

145. As a result of the illicit prior agreement and actions in furtherance of the conspiracy described above, Plaintiff's rights were violated, and she suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous injuries and damages set forth above.

## COUNT VII
### Malicious Prosecution
*Brought under State Law Against All Defendants*

146. Each paragraph of this Complaint is incorporated as if restated fully herein.

147. In the manner described more fully above, Defendants, individually, jointly, and in conspiracy with one another, and others unknown, instituted or continued the prosecution of Plaintiff without probable cause. As a consequence of the criminal prosecution, Plaintiff was unlawfully seized, deprived of liberty, and wrongfully convicted of a crime of which she is innocent.

148. Defendants acted intentionally or, in the alternative, maliciously, in causing these judicial proceedings to be carried out against Plaintiff.

149. Plaintiff's criminal prosecution was terminated in her favor.

150. As a result of Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous injuries and damages.

151. Defendants were acting within the scope of their employment when they took these actions. Through the doctrine of respondeat superior, Defendant St. Joseph is liable as a principal for all torts committed by its employees and agents, including the misconduct by the Individual Defendants described in this Count.

### COUNT VIII
### Conspiracy
*Brought Under State Law Against All Individual Defendants*

152. Plaintiff incorporates all of the paragraphs in this Complaint as if fully restated here.

153. In the manner described more fully above, prior to Plaintiff's conviction, the Individual Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to violate Plaintiff's rights, as described in this Complaint.

154.     The Individual Defendants agreed to investigate and to exert influence to cause the prosecution of Plaintiff for a crime she did not commit and took overt actions in conformity with that agreement.

155.     As further described above, the Individual Defendants agreed to direct the investigation of the Jeschke murder to focus the investigation on Plaintiff, who they knew or should have known was innocent; to fabricate evidence against Plaintiff, including a coerced confession; and to suppress and fail to preserve exculpatory and impeachment evidence in violation of *Brady v. Maryland*, all in furtherance of their scheme to maliciously prosecute Plaintiff.

156.     In so doing, the Individual Defendants conspired to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability by depriving Plaintiff of her rights.

157.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered an unjust conviction, loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous injuries and damages as set forth above.

158.     Defendants were acting within the scope of their employment when they took these actions. Through the doctrine of *respondeat superior*, Defendant City of St. Joseph is liable as a principal for all torts committed by its employees and agents, including the misconduct by the Individual Defendants described in this Count.

**COUNT IX**
**Intentional Infliction of Emotional Distress**
*Brought Under State Law Against All Defendants*

159.     Plaintiff incorporates by reference herein the allegations set forth in this Complaint.

160. In the manner described more fully above, Defendants, individually, jointly, and in conspiracy with one another, and others unknown, engaged in extreme and outrageous conduct by fabricating evidence, suppressing exculpatory and impeachment evidence, conducting a reckless investigation, and otherwise causing her wrongful prosecution, conviction and incarceration for a crime he did not commit.

161. Defendants' actions were rooted in an abuse of power or authority.

162. Defendants' conduct was undertaken with reckless disregard of the high probability that the conduct would cause severe emotional distress to Plaintiff.

163. As a result of Defendants' misconduct, Plaintiff suffered severe emotional distress, which was a reasonably foreseeable consequence of Defendants' conduct.

164. The misconduct in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

165. Defendants were acting within the scope of their employment when they took these actions. Through the doctrine of *respondeat superior*, Defendant City of St. Joseph is liable as principal for all torts committed by its employees and agents, including the misconduct by the Individual Defendants described in this Count.

## COUNT X
### Indemnification
*Brought Under State Law Against the City of St. Joseph*

166. Plaintiff incorporates all of the paragraphs in this Complaint as if fully restated herein.

167. In committing the tortious conduct alleged in Counts VII, VIII and IX, the Individual Defendants were members and agents of the City of St. Joseph acting at all relevant times within the scope of their employment.

168. The City of St. Joseph is liable as the principal for all torts committed by its agents.

169. The City of St. Joseph purchased and maintained policies of insurance that provided insurance coverage for the misconduct alleged in this Complaint. These policies included but were not limited to an insurance policy issued by Hartford that covered the false arrest, detention or imprisonment, or malicious prosecution alleged in this Complaint. Collectively, the insurance policies provided insurance coverage in amounts yet to be determined but in excess of two million dollars in maximum coverage. By purchasing insurance policies that more than two million dollars in coverage for the misconduct alleged in this case, the City of St. Joseph waived sovereign immunity under Mo. Rev. Stat. § 537.610.

WHEREFORE, Plaintiff SANDRA HEMME respectfully requests that this Court enter judgment in her favor and against Defendants, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the Individual Defendants, as well as any other relief this Court deems appropriate.

**JURY DEMAND**

Plaintiff SANDRA HEMME hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**SANDRA HEMME**

By: /s/ Locke Bowman
*One of Plaintiff's Attorneys*

Jon Loevy* (IL #6218254)          Kent Emison
Locke Bowman* (IL #6184129)       Mark Emison
Justin Hill* (IL #6342031)        Michael Manners

LOEVY & LOEVY
311 North Aberdeen Street, 3rd Floor
Chicago, IL 60607
(312) 243-5900
jon@loevy.com
locke@loevy.com
hill@loevy.com

LANGDON & EMISON
911 Main St.
Lexington, MO 64067
kent@lelaw.com
mark@lelaw.com
mike@lelaw.com

\*Pro hac vice admission pending